# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ALEATHIA DUVALL, *individually and* :
*as administratrix of the estate of Christopher*:
*Sowell, et al.,* :
          **Plaintiffs,** :
     :
v.                    :      **CIVIL ACTION NO. 18-3278**
     :
**ADRIAN HUSTLER,** *et al.*,      :
          **Defendants.**      :

FILED

MAR 19 2020

KATE BARKMAN, Clerk
_____ Dep. Clerk

## MEMORANDUM OPINION

**Rufe, J.**                                                       **March 19, 2020**

This tragic case concerns the fatal shooting of Christopher Sowell by nine Philadelphia police officers. Sowell, a thirty-two-year-old man with a history of mental health issues, was sought by police after he attacked his two minor children and a minor relative. The officers found him on the front steps of a friend's nearby home. Sowell's behavior there, the officers have testified, led them to believe that he posed an imminent threat to their safety. The officers opened fire. Collectively, they fired 109 rounds at Sowell. Twenty-five bullets struck Sowell, killing him.

His mother, Aleathia Duvall, and the mother of his children, Hyshonda Hinton, sued the nine officers and the City of Philadelphia. Duvall, the administratrix of Sowell's estate, brings this action on his behalf directly and pursuant to the Pennsylvania Survival Act, as well as on her own behalf through the Pennsylvania Wrongful Death Act.[1] Hinton brings a wrongful death action as parent-guardian of Sowell's minor children.[2]

Plaintiffs assert a claim of excessive force under 42 U.S.C. § 1983 against all defendants.[3] They also assert claims of assault and battery under Pennsylvania state law and under § 1983.[4] They assert a state-law claim of intentional infliction of emotional distress against all defendants.[5] Finally, they assert a *Monell* claim against Defendant City of Philadelphia for failure to train, supervise, and discipline its officers.[6]

## I. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Facts that could affect the outcome are 'material facts,' and a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party."[7]

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party" and make every reasonable inference in that party's favor.[8] Further, a court may not weigh the evidence or make credibility determinations.[9] Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record.[10] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[11] Therefore, if, after making all

---

[3] *Id.* ¶¶ 33–37.

[4] *Id.* ¶¶ 38–58.

[5] *Id.* ¶¶ 59–63.

[6] *Id.* ¶¶ 64–77.

[7] *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011).

[8] *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

[9] *Boyle v. Cty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998).

[10] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

[11] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (internal citations omitted).

reasonable inferences in favor of the non-moving party, the court determines that there is no genuine dispute as to any material fact, summary judgment is appropriate.[12]

## II. BACKGROUND

### A. The Hazel Avenue Attack

Christopher Sowell lived with his partner, Hyshonda Hinton, and their two minor children.[13] He was a "fun dad" who took his children shopping and bike-riding and to amusement parks.[14] He had a history of substance abuse and depression.[15] About a year before he was killed, he had completed inpatient treatment for both conditions.[16]

On September 28, 2016, Sowell apparently experienced a mental health- or drug-related episode during which he attacked his two minor children and a minor relative at his house on Hazel Avenue.[17] He choked one of them to the point of unconsciousness and injured the other two with a knife.[18] The children called police.[19] A report went out over police radio of a "person with a gun. Report of someone shot on the highway."[20] Philadelphia police officers arrived at the Hazel Avenue house just after Sowell left.[21] The officers found two children "covered in blood"

---

[12] *Wisniewski v. Johns–Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

[13] A. Dep. [Doc. No. 31-1], Mar. 6, 2019, at 9–10, 12; Pls.' Mem. Opp. Summ. J. [Doc. No. 25], Ex. 2.

[14] C. Dep. [Doc. No. 31-2], Mar. 6, 2019, at 8–9; A. Dep. [Doc. No. 31-1], Mar. 6, 2019, at 10–12; Finney Dep. [Doc. No. 31-4], at 11–12.

[15] Pls.' Mem. Opp. Summ. J. [Doc. No. 25], Ex. 2; A. Finney Dep. [Doc. No. 31-4], at 12.

[16] Pls.' Mem. Opp. Summ. J. [Doc. No. 25], Ex. 2.

[17] A. Dep. [Doc. No. 31-1], Mar. 6, 2019, at 27. The Court has taken care to keep the identities of those minor children private for purposes of this Opinion.

[18] A. Dep. [Doc. No. 31-1], Mar. 6, 2019, at 15–17; C. Dep. [Doc. No. 31-2], Mar. 6, 2019, at 18–20; J. Dep. [Doc. No. 31-3], May 14, 2019, at 15–22.

[19] A. Dep. [Doc. No. 31-1], Mar. 6, 2019, at 19.

[20] Statement of Stipulated Material Facts [Doc. No. 23-1] ¶ 1.

[21] A. Dep. [Doc. No. 31-1], Mar. 6, 2019, at 19.

3

across the street from the house and called for medical assistance.[22] Meanwhile, inside the house, officers searched for a photo of Sowell, whom the third child identified as the attacker.[23] She also told the officers that Sowell "saw demons" or "saw them as demons."[24]

With that information, the officers began to search the neighborhood for Sowell. Another report of a "possible gun shot wound to the chest" circulated on police radio as they searched.[25] Officer Michael Kane searched Sowell's name in his Mobile Data Terminal and found a second nearby address associated with him: 731 Cobbs Creek Parkway.[26] He knocked on the door of a house around the corner from 731 Cobbs Creek to ask the occupants whether Sowell might be at the Cobbs Creek house.[27] Then Officer Kane proceeded to the Cobbs Creek house.[28]

## B. The Cobbs Creek Attack

While the officers were responding to the Hazel Avenue house and beginning their search, Sowell had indeed gone to the Cobbs Creek house, which was the home of a close family friend, Antoinette Finney.[29] Sowell rang her doorbell and asked if he could come inside and use Finney's bathroom.[30] She agreed, and he went upstairs to the bathroom for about fifteen to twenty minutes.[31] When he came down, he asked Finney for a snack and some water.[32] Finney

---

[22] Green Dep [Doc. No. 31-6], Feb. 28, 2019, at 9–10.

[23] A. Dep. [Doc. No. 31-1], Mar. 6, 2019, at 28–29.

[24] Olesik Dep. [Doc. No. 31-10], Jan. 16, 2019, at 13.

[25] Statement of Stipulated Material Facts [Doc. No. 23-1] ¶ 7.

[26] Kane Dep. [Doc. No. 31-8], Jan. 16, 2019, at 15–17.

[27] *Id.* at 16–17.

[28] *Id.* at 17–18.

[29] Finney Dep. [Doc. No. 31-4], May 14, 2019, at 7–14.

[30] *Id.* at 14.

[31] *Id.* at 16.

[32] *Id.* at 18.

went to the kitchen to get it for him.[33] He followed her, grabbed her from behind, and choked her.[34] Finney passed out and fell to the floor.[35] When she came to, she saw a butcher knife on the floor and heard her adult daughter, who lives with her and is intellectually disabled, saying to Sowell, "Why are you doing this to us Chris?"[36] Finney got up off the floor, grabbed the phone on her way back to the living room, and called police.[37] By the time she reached the living room, Sowell was gone.[38] Finney then heard popping noises and saw flashes from outside.[39] She "didn't hear the police" and believed Sowell was setting off firecrackers.[40]

## C. The Sowell Shooting

Nine Philadelphia police officers arrived at the Cobbs Creek house in quick succession, where they found Sowell on the front porch. The officers testified that Sowell had his right hand in his pocket and ignored verbal commands to remove it. They testified that he pulled his hand out suddenly, drawing a handgun and pointing it at Officer Kane. The officers testified that they saw a muzzle flash and heard a popping sound characteristic of gunfire. At that point, the officers testified, they each returned fire, shooting until Sowell fell to the ground. Despite a thorough

---

[33] *Id.*

[34] *Id.* at 18–19.

[35] *Id.* at 20.

[36] *Id.* at 6, 20–21; *see id.* at 51–52. Finney's daughter Camille also gave a deposition, but it does not shed much light on this incident. *See generally* C. Finney Dep. [Doc. No. 31-5], May 14, 2019. Both Camille and Antoinette Finney testified that Sowell punched Camille in the face. *Id.* at 5; A. Finney Dep. [Doc. No. 31-4], May 14, 2019, at 24.

[37] Finney Dep. [Doc. No. 31-4], May 14, 2019, at 21.

[38] *Id.*

[39] *Id.*

[40] *Id.* at 21–22, 26.

5

search, however, no gun or other weapon was found on Sowell's person or near his body.[41] Instead, a broken cell phone was found under him.[42]

### 1. Officer Kane's Testimony

Officer Kane testified to the following sequence of events: As he approached the Cobbs Creek house he heard screaming and thought he saw a man and a woman struggling in the doorway.[43] On the front steps, Sowell turned to face Officer Kane and "concentrated on [him]."[44] To the best of Officer Kane's recollection, Sowell did not close the front door behind him.[45] Sowell's hand was in his pocket and Officer Kane ordered him to show his hands.[46] Sowell suddenly pulled his hand out of his pocket, drawing an object that made Officer Kane believe that he was "looking straight at a barrel" of a gun.[47] Officer Kane saw a "flash" that was "whitish blue" and heard a "gunshot."[48] He opened fire, shooting ten rounds.[49]

### 2. Officer Green's Testimony

Officer Ronald Green testified as follows: After initially responding to the Hazel Avenue house with his partner, Officer Adrian Hustler, he set out to search the neighborhood for Sowell.[50] When Officer Green arrived at the Cobbs Creek house, Sowell was coming out onto the front porch and Officer Kane was out front with a flashlight pointing at Sowell on the front

---

[41] Statement of Stipulated Material Facts [Doc. No. 23-1] ¶ 34.

[42] *Id.* ¶ 33.

[43] Kane Dep. [Doc. No. 31-8], Jan. 16, 2019, at 18, 25.

[44] *Id.* at 18.

[45] *Id.* at 25–26.

[46] *Id.* at 18–19.

[47] *Id.* at 19.

[48] *Id.* at 19, 26.

[49] *Id.* at 19, 28.

[50] Green Dep. [Doc. No. 31-6], Feb. 28, 2019, at 7, 10–11.

porch.[51] Officer Kane was ordering Sowell to take his hands out of his pockets and other officers were also yelling verbal commands at Sowell.[52] Sowell ignored the commands.[53] Then he took a step back, "went into a crouch position," and drew "what appeared to be the barrel of a firearm."[54] Officer Green "saw a muzzle flash and heard a pop as in a gunshot."[55] Believing that Officer Kane had been shot, Officer Green fired at Sowell.[56] Officer Green fired "until [Sowell] was no longer a threat as he went down."[57] Officer Green thought he fired ten rounds at Sowell in at least two separate "bursts" separated by a few seconds.[58]

### 3. Officer Hustler's Testimony

Officer Adrian Hustler testified that he arrived at the Cobbs Creek house on foot shortly after Officer Kane.[59] He saw Sowell come out onto the porch with his right hand in his pocket.[60] Officer Hustler and Officer Kane both ordered Sowell to take his hands out of his pockets.[61] Sowell ignored those commands.[62] Sowell "took a little step back and crouched a little bit," a position Officer Hustler described as a "shooting stance," and took "his right hand out of his pocket producing a black handgun."[63] He raised his left hand as if to steady the gun.[64] Officer

---

[51] *Id.* at 12.
[52] *Id.* at 12, 14.
[53] *Id.* at 12.
[54] *Id.* at 12–13.
[55] *Id.* at 13.
[56] *Id.* at 13, 18.
[57] *Id.*
[58] *Id.* at 13–14.
[59] Hustler Dep. [Doc. No. 31-7], Jan. 31, 2019, at 11–12.
[60] *Id.* at 12.
[61] *Id.* at 12.
[62] *Id.* at 12.
[63] *Id.* at 12, 19.
[64] *Id.* at 12, 19.

7

Hustler "heard a gunshot and saw a muzzle flash" that was "a white yellowish color."[65] At that point, he "opened fire."[66] Officer Hustler fired twelve to fourteen rounds, shooting until Sowell "went down."[67]

## 4. Officer Britton's Testimony

Officer Anthony Britton, Jr., gave the following testimony: Officer Britton followed Officer Kane to the house around the corner from the Cobbs Creek house, and then to the Cobbs Creek house.[68] Officer Britton saw Sowell come out of the house and onto the porch, where Officer Kane "started screaming to let me see your hands."[69] Sowell assumed "what [Officer Britton] would consider a shooting stance."[70] He "abruptly removed his hand" from his pocket and "pointed what [Officer Britton] believed to be a firearm in the direction of Officer Kane and fired a shot."[71] Officer Britton "saw a muzzle flash" that was "orange and yellow" and fired at Sowell.[72] Officer Britton fired twelve rounds at Sowell and stopped firing once "the threat was gone" because Sowell had gone down.[73]

## 5. Officer Olesik's Testimony

Officer Jeremy Olesik testified as follows: Officer Olesik set out from the Hazel Avenue house in pursuit of Sowell.[74] He made his way toward the Cobbs Creek house.[75] Officer Olesik

---

[65] *Id.* at 19.

[66] *Id.* at 12.

[67] *Id.* at 12, 20–21.

[68] Britton Dep. [Doc. No. 31-9], Jan. 31, 2019, at 11–14.

[69] *Id.* at 14.

[70] *Id.* at 17.

[71] *Id.* at 17.

[72] *Id.* at 17–18.

[73] *Id.* at 21–22.

[74] Olesik Dep. [Doc. No. 31-10], Jan. 16, 2019, at 21.

[75] *Id.* at 21–23.

saw Sowell come out of the house with his right hand in his pocket.[76] Sowell ignored commands to show his hands.[77] He turned his body sideways, took a step back, "quickly removed his hand from his right pocket, brought it up into a stance," and "removed a black object."[78] He brought his left hand up to meet his right.[79] Officer Olesik "observed a muzzle flash" and "heard a pop."[80] Officer Olesik discharged his weapon, firing eighteen rounds, and continued firing until Sowell hit the ground.[81]

### 6. Officer Thompson's Testimony

Officer Thomas Thompson testified that he was in a car with Officer Walton when they responded to the radio call.[82] They responded directly to the Cobbs Creek house, pulling up behind Officer Kane just as he was arriving.[83] Sowell came out of the house and stood facing Officer Kane.[84] Officer Kane ordered him to take his hands out of his pockets and Sowell "abruptly" did so, holding "a black object which appeared to be a gun."[85] Officer Thompson "saw a muzzle flash" and "heard a bang, and that's when [he] started to discharge [his] weapon."[86] Officer Thompson fired thirteen rounds at Sowell, who was "just standing there for a good five seconds" before falling to the ground.[87]

---

[76] *Id.* at 25–26.
[77] *Id.* at 26.
[78] *Id.*
[79] *Id.*
[80] *Id.*
[81] *Id.* at 26, 32.
[82] Thompson Dep. [Doc. No. 31-13], Feb. 28, 2019, at 8.
[83] *Id.* at 8–9.
[84] *Id.* at 9, 12
[85] *Id.* at 9.
[86] *Id.* at 9; *see id.* at 14–15.
[87] *Id.* at 9–10.

9

### 7. Officer Walton's Testimony

Officer Scott Walton testified to the following sequence of events: Officer Walton responded to the initial radio call by car, but by the time he got near the area, the crime scene was secured, so he began to survey the area in pursuit of Sowell.[88] He came upon Officer Kane with his spotlight illuminating the front of the Cobbs Creek house.[89] He saw Sowell come out of the house and walk down the steps to the landing.[90] Officer Kane was instructing Sowell to show his hands, and Sowell "very quickly" pulled his right hand out of his pocket.[91] Officer Walton testified that he "saw a black object. And the way he was holding it, I assumed—it resembled a firearm."[92] Sowell "assumed the firing position" and Officer Kane shouted "drop your gun, drop your gun."[93] Officer Walton "hear[d] a gunshot coming from the area of Mr. Sowell."[94] He did not see a muzzle flash coming from Sowell's area.[95] Officer Walton shot at Sowell, who "started to fall back," at which point Officer Walton stopped firing.[96] Officer Walton fired ten rounds at Sowell.[97]

### 8. Officer Edwards's Testimony

Officer Richard Edwards gave the following testimony: Officer Edwards was on patrol in a car with his partner, Officer Timothy Moebius, when they responded to the radio call for the

---

[88] Walton Dep. [Doc. No. 31-12], Feb. 28, 2019, at 7–8.

[89] *Id.* at 8.

[90] *Id.* at 8, 11.

[91] *Id.*

[92] *Id.* at 11.

[93] *Id.* at 9.

[94] *Id.*

[95] *Id.* at 12–13.

[96] *Id.* at 9.

[97] *Id.* at 10.

Hazel Avenue house.[98] As more reports came in, they headed directly to the Cobbs Creek house. As they arrived at the Cobbs Creek house, Officer Kane's car was pulling up in the other direction.[99] Officer Edwards heard "screaming of a female" and told his partner to stop the car.[100] Officer Kane passed them in his car and put his spotlight on.[101] Officer Edwards saw a "silhouette" at the Cobbs Creek house.[102] He did not see anyone else in the doorway.[103] Sowell came out of the house and down the steps with his hand in his pocket.[104] He "went into a stance" and was "focused straight on" Officer Kane.[105] Sowell "took his right hand out of his pocket" holding "what appeared to be a black firearm." Officer Edwards testified: "We saw a blue—a muzzle flash that was like white and orange in color and the sound of what appeared to be a gunshot."[106] Officer Edwards discharged his weapon; he believed he fired eight rounds at Sowell.[107]

### 9. Officer Moebius's Testimony

Officer Timothy Moebius testified as follows: Officer Moebius was on patrol with his partner, Officer Edwards, when they responded to a call to the Hazel Avenue house.[108] Before they reached the Hazel Avenue house, they received another call and proceeded directly to the

---

[98] Edwards Dep. [Doc. No. 31-11], Jan. 16, 2019, at 9.
[99] *Id.* at 10.
[100] *Id.*
[101] *Id.*
[102] *Id.* at 10, 18.
[103] *Id.* at 17.
[104] *Id.* at 11.
[105] *Id.* at 13.
[106] *Id.*
[107] *Id.*
[108] Moebius Dep. [Doc. No. 25-14], Jan. 31, 2019, at 17.

11

Cobbs Creek house.[109] When they reached the Cobbs Creek house, Officer Moebius "heard screaming" and Officer Edwards told him to stop the car.[110] They got out of the car and Officer Moebius saw Sowell standing at the top of the steps with his right hand in his pocket.[111] There were other officers already on the scene.[112] Officer Moebius testified: "We gave orders for Mr. Sowell to show us his hand."[113] He did not comply right away; instead, he "abruptly moved his right hand—removed his right hand from his pocket, bringing up a black firearm, firing a shot."[114] Officer Moebius saw a white muzzle flash from Sowell's direction.[115] He fired fourteen shots at Sowell, shooting until he felt "the threat was no longer a threat."[116]

### D. The Internal Affairs Investigation

Sergeant Tamika Allen arrived at the Cobbs Creek house as the officers were firing; she stood back around the corner until the gunfire stopped.[117] Sergeant Allen went to the steps in front of the house, where Sowell had fallen. She and another officer cuffed Sowell, who was still moving at that point and "actually sat up."[118] Sergeant Allen and several officers conducted a

---

[109] *Id.*

[110] *Id.* at 18.

[111] *Id.* at 18–20.

[112] *Id.* at 20.

[113] *Id.*

[114] *Id.* at 21; *see id.* at 36.

[115] *Id.* at 28, 35.

[116] *Id.* at 28–29, 35.

[117] Allen Dep. [Doc. No. 31-14], Mar. 27, 2019*, at 21–22 [*Note: This deposition is dated March 27, 2010, eight years before this case was filed; it most likely took place on March 27, 2019.].

[118] *Id.* at 23–24.

12

thorough search for a weapon near Sowell, as other offices had "relayed that the male had taken a shot at them with a weapon, with a gun."[119] No gun was found.[120]

Sergeant Michael Rafferty was the next supervisor to arrive.[121] Once the scene was "more under control," the two sergeants gathered the nine officers who had discharged their weapons.[122] The sergeants collected the officers' magazines, which were bagged as evidence by SWAT.[123] The sergeants spoke with the officers and asked them to describe what happened.[124] Sergeant Allen asked each officer where they were positioned and what they saw.[125] Sergeant Allen testified that these conversations took place in a group; the sergeants did not take each officer aside individually. By contrast, Sergeant Rafferty testified that the officers were interviewed separately, not as a group.[126] The "Internal Affairs Shooting Team" arrived and talked to the officers.[127] One of the shooting team investigators on the scene was Lieutenant Michael Young,[128] who was the assigned investigator on the Sowell shooting. Sergeant Allen saw Lieutenant Young talking to the officers and "investigating the events that had occurred."[129]

---

[119] *Id.* at 25–26; *see* Moebius Dep. [Doc. No. 25-14], Jan. 31, 2019, at 35; Britton Dep. [Doc. No. 25-15], Jan. 31, 2019, at 25–26; Rafferty Dep. [Doc. No. 25-19], Mar. 27, 2019\*, at 23 [\*Note: This deposition is dated March 27, 2010, eight years before this case was filed; it most likely took place on March 27, 2019.]. They even searched the roof of the house. Finney Dep. [Doc. No. 31-4], May 14, 2019, at 26–27.

[120] Statement of Stipulated Material Facts [Doc. No. 23-1] ¶ 34.

[121] Allen Dep. [Doc. No. 31-14], Mar. 27, 2019\*, at 23.

[122] *Id.* at 26.

[123] *Id.* at 28.

[124] *Id.* at 34–36.

[125] *Id.* at 36.

[126] Rafferty Dep. [Doc. No. 25-19], Mar. 27, 2019\*, at 26.

[127] Allen Dep. [Doc. No. 31-14], Mar. 27, 2019\*, at 28.

[128] *Id.* at 29.

[129] *Id.* at 29–30.

Eventually, a van arrived to transport the officers to the Internal Affairs Department for the next phase of the investigation.[130] Sergeant Rafferty and Sergeant Allen transported the officers to Internal Affairs.[131] Per Philadelphia Police Department policy, the officers would not be interviewed about the shooting until after the District Attorney's Office determined whether to charge them in connection with the shooting.[132] Instead, the two sergeants would report the information they had collected to Internal Affairs. Sergeant Allen testified that there were conversations during the drive for the purpose of "getting clarity again" regarding the "information that [she] had to provide for IAD."[133] Sergeant Rafferty, however, testified that there were no conversations during the drive.[134] Most of the officers likewise testified that there were no conversations about what had happened after the shooting or during the drive.[135] In accordance with Department policy, the officers were not interviewed until the District Attorney's Office declined to file charges.[136]

---

[130] *Id.* at 28–29.

[131] *Id.* at 42.

[132] Young Dep. [Doc. No. 25-9], Mar. 27, 2019*, at 13–14 [*Note: This deposition is dated March 27, 2010, eight years before this case was filed; it most likely took place on March 27, 2019.].

[133] Allen Dep. [Doc. No. 31-14], Mar. 27, 2019*, at 42–43.

[134] Rafferty Dep. [Doc. No. 25-19], Mar. 27, 2019*, at 28.

[135] Green Dep. [Doc. No. 25-6], Feb. 28, 2019, at 23–24; Thompson Dep. [Doc. No. 25-17], Feb. 28, 2019, at 18; Walton Dep. [Doc. No. 25-5], Feb. 28, 2019, at 15–16; Hustler Dep. [Doc. No. 25-16], Jan. 31, 2019, at 25, 30; Britton Dep. [Doc. No. 25-15], Jan. 31, 2019, at 27–28; Kane Dep. [Doc. No. 25-4], Jan. 16, 2019, at 33; Moebius Dep. [Doc. No. 25-14], Jan. 31, 2019, at 31–34. *But see* Olesik Dep. [Doc. No. 25-3], Jan. 16, 2019, at 42–43.

[136] Young Dep. [Doc. No. 25-9], Mar. 27, 2019*, at 13–14; *see* Moebius Dep. [Doc. No. 25-14], Jan. 31, 2019, at 46, 49 (noting that Officer Moebius was interviewed by Lieutenant Young on February 14th, 2017, about four-and-a-half months after the shooting, and that the interview was not recorded by a stenographer).

14

### E. Philadelphia Police Department Practices

#### 1. Officer Supervision and Discipline

In 2004, the Philadelphia Police Department's Integrity and Accountability Office ("IAO") issued a report regarding the use of firearms by Philadelphia police officers.[137] After studying officer-involved shootings from 1998 to 2003, IAO found a number of problems with, among other things, the Philadelphia Police Department's investigatory procedures following officer-involved incidents.[138] The report gave particular attention to the Department's practice of taking manual dictation during interviews rather than audio- or video-recording them.[139] It identified major concerns with this practice and noted that the Philadelphia Police Department was "one of the last major law enforcement agencies in the nation that does not audio-tape or video-tape the interviews of witnesses and officers."[140] IAO recommended that the Department "require that all police witnesses submit to audio and/or video taped interviews."[141]

Around a decade later, Philadelphia Police Commissioner Charles Ramsey asked the Department of Justice to study and make recommendations regarding the Department's use-of-force practices in light of "an increase in use of force and a fractured relationship with community stakeholders."[142] That study found that the Department had not implemented IAO's recommendation; instead, the Department's practice was still to take "typed notes" during interviews and not to audio- or video-record them.[143] It also found fault with the Department's

---

[137] IAO Report [Doc. No. 25-7] at 4–5.

[138] *Id.* at 5–7; IAO Report [Doc. No. 25-8] at 39–47.

[139] IAO Report [Doc. No. 25-8] at 45–46.

[140] *Id.* at 46.

[141] *Id.* at 48.

[142] DOJ Report [Doc. No. 25-12] at vii, 1.

[143] *Id.* at 6.

15

practice of not interviewing officers involved in use-of-force incidents until after the District Attorney's Office declined charges, which meant officers were typically not interviewed for at least three months after the incident occurred.[144] The DOJ report recommended that all witness interviews be audio- and video-recorded and that all officers be interviewed "as soon as practical" and always within 72 hours.[145]

Those recommendations still had not been implemented in September 2016 when Sowell was shot and killed.[146] The officers who shot Sowell were not interviewed until after the District Attorney declined charges and their interviews were not audio- or video-recorded.[147]

## 2. Officer Training

The 2015 DOJ report also identified problems with the Philadelphia Police Department's standard practices regarding tasers.[148] It found that the Department issued tasers only to officers who completed an optional crisis-intervention training program.[149] As a result, "less-lethal tools" were not available to all officers. The report recommended that the Department should "decouple" the availability of tasers from the crisis-intervention training and make tasers "standard-issue weapons" for all officers "assigned to uniformed enforcement units."[150] That recommendation had not been implemented as of September 2016.[151]

---

[144] Id.

[145] Id. at 6–7.

[146] Young Dep. [Doc. No. 25-9], March 27, 2019*, at 13–14, 30.

[147] Id.

[148] DOJ Report [Doc. No. 25-12] at 4. The DOJ report identified a host of other problems in the Department's training and supervision as well, including that officers "do not receive regular, consistent training on the department's deadly force policy." Id. Plaintiffs have based their failure-to-train and failure-to-supervise/discipline claims specifically on the Department's taser training and interviewing practices and have not raised any of the other broad problems discussed in the DOJ report.

[149] Id.

[150] Id.

[151] Cuddahy Dep. [Doc. No. 25-10], June 26, 2019, at 29, 58–60. Officer Cuddahy testified that decoupling tasers from crisis-intervention training "ha[d] occurred," but clarified that tasers were still issued only to officers who

16

## III. DISCUSSION

### A. Excessive Force Claim: Qualified Immunity[152]

When a suit against a law-enforcement officer asserts a constitutional violation, courts

engage in a two-step inquiry at the summary judgment stage.[153] First, courts consider whether,

on the facts in the summary judgment record when viewed in the light most favorable to the non-

movant, the officers' conduct violated a constitutional right.[154] Second, if a constitutional

violation did occur, courts ask whether the officers' conduct violated clearly established law.[155]

"Officers who have probable cause to arrest a defendant may use force to effectuate the

arrest, but they cannot use 'excessive force.'"[156] "The elements of 'a claim for excessive force as

an unreasonable seizure under the Fourth Amendment' are: (1) 'that a "seizure" occurred,' and

(2) that the seizure 'was unreasonable.'"[157]

---

underwent crisis-intervention training—the only change implemented was that officers must now undergo *both* crisis-intervention training *and* a separate taser training to be issued a taser, whereas before the taser training was part of the crisis-intervention program. *Id.* at 58–60.

[152] Because the two-part qualified immunity inquiry includes an analysis of whether a constitutional violation occurred, the Court will consider Defendants' argument that summary judgment is warranted because no constitutional violation occurred under this rubric.

[153] *Saucier v. Katz*, 533 U.S. 194, 197 (2001), *rev'd on other grounds, Pearson v. Callahan*, 555 U.S. 223 (2009). Courts are no longer required to consider the two steps in this order, *Pearson*, 555 U.S. at 236, but the Court finds it appropriate to do so here.

[154] *Saucier*, 533 U.S. at 201 ("A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?").

[155] *Id.* ("[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established."). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (internal citation and quotation omitted).

[156] *Fields v. City of Pittsburgh*, 714 F. App'x 137, 141 (3d Cir. 2017) (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 515 (3d Cir. 2003)).

[157] *Id.* (quoting *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999).

17

In deadly-force cases like this one, where both the constitutional inquiry and the "clearly established" inquiry turn on reasonableness, it might appear that these two questions merge into a single analysis. That is, if on the facts it appears that the force used was objectively unreasonable, it might seem unnecessary to ask separately whether "a reasonable officer, identically situated, [could] have believed the force employed was lawful[.]"[158] The Supreme Court has specifically rejected that position, however. Instead, the question whether the law was clearly established requires its own separate analysis that cannot be fused with the analysis of the underlying constitutional question.[159]

The question to be asked at the first step is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"[160] The question at the second step is whether "the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."[161] "Courts have discretion to decide the order in which to engage these two prongs. But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment."[162]

## 1. Constitutional Inquiry

The officers argue that as a matter of law, no constitutional violation occurred, because viewing the facts in the light most favorable to Plaintiffs, the use of deadly force against Sowell was objectively reasonable. The officers' version of events goes like this: On the evening of the

---

[158] *Saucier*, 533 U.S. at 210 (Ginsburg, J., concurring).

[159] *Id.* at 197.

[160] *Id.* at 201.

[161] *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014).

[162] *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

18

shooting, the officers were responding to reports over police radio of a "person with a gun" and "someone shot on the highway" and of a victim with "possible gun shot [sic] wounds."[163] After responding to the Hazel Street house, Officer Kane arrived at the Cobbs Creek house and saw Sowell struggling with a woman in the doorway.[164] The other officers arrived in quick succession.[165] Sowell came out onto the front porch and stood with his hands in his pockets.[166] Sowell ignored the officers' commands and stared threateningly at Officer Kane.[167] Suddenly, Sowell drew a black object that looked like a gun out of his right pocket, took a step back, turning his body sideways, and brought the object up into a shooting stance with both hands.[168] Eight of nine officers testify that they saw a muzzle flash and all nine say they heard a gunshot coming from Sowell's area.[169] The officers opened fire only after seeing and hearing a gunshot and continued firing only until Sowell went down.[170]

Plaintiffs tell a very different story, pointing primarily to two discrepancies in the officers' testimony. First, it is undisputed that Sowell had no gun.[171] The officers' testimony that

---

[163] Statement of Stipulated Material Facts [Doc. No. 23-1] ¶ 1.

[164] Kane Dep. [Doc. No. 31-8], Jan. 16, 2019, at 17–18.

[165] Green Dep. [Doc. No. 31-6], Feb. 28, 2019, at 11–12; Hustler Dep. [Doc. No. 31-7], Jan. 31, 2019, at 11–12; Britton Dep. [Doc. No. 31-9], Jan. 31, 2019, at 14; Edwards Dep. [Doc. No. 31-11], Jan. 16, 2019, at 10; Walton Dep. [Doc. No. 31-12], Feb. 28, 2019, at 8; Thompson Dep. [Doc. No. 31-13], Feb. 28, 2019, at 9; Moebius Dep. [Doc. No. 25-14], Jan. 31, 2019, at 17.

[166] Green Dep. [Doc. No. 31-6], Feb. 28, 2019, at 12; Olesik Dep. [Doc. No. 31-10], Jan. 16, 2019, at 25–26.

[167] Kane Dep. [Doc. No. 31-8], Jan. 16, 2019, at 18; Green Dep. [Doc. No. 31-6], Feb. 28, 2019, at 12; Britton Dep. [Doc. No. 31-9], Jan. 31, 2019, at 17; Olesik Dep. [Doc. No. 31-10], Jan. 16, 2019, at 26.

[168] Green Dep. [Doc. No. 31-6], Feb. 28, 2019, at 12–13; Hustler Dep. [Doc. No. 31-7], Jan. 31, 2019, at 11; Britton Dep. [Doc. No. 31-9], Jan. 31, 2019, at 17–18; Olesik Dep. [Doc. No. 31-10], Jan. 16, 2019, at 26.

[169] Green Dep. [Doc. No. 31-6], Feb. 28, 2019, at 13; Hustler Dep. [Doc. No. 31-7], Jan. 31, 2019, at 12; Britton Dep. [Doc. No. 31-9], Jan. 31, 2019, at 17; Olesik Dep. [Doc. No. 31-10], Jan. 16, 2019, at 26; Edwards Dep. [Doc. No. 31-11], Jan. 16, 2019, at 13; Walton Dep. [Doc. No. 31-12], Feb. 28, 2019, at 9; Thompson Dep. [Doc. No. 31-13], Feb. 28, 2019, at 9; Moebius Dep. [Doc. No. 25-14], Jan. 31, 2019, at 21; Kane Dep. [Doc. No. 31-8], Jan. 16, 2019, at 19, 26.

[170] Green Dep. [Doc. No. 31-6], Feb. 28, 2019, at 13; Hustler Dep. [Doc. No. 31-7], Jan. 31, 2019, at 12; Britton Dep. [Doc. No. 31-9], Jan. 31, 2019, at 21–22; Olesik Dep. [Doc. No. 31-10], Jan. 16, 2019, at 32–33.

[171] Statement of Stipulated Material Facts [Doc. No. 23-1] ¶ 34.

19

they saw and heard Sowell fire a gun, they argue, therefore calls into question the credibility of the officers' entire account, since this contradiction goes completely unexplained. Second, Plaintiffs point out that all nine officers and Sergeant Rafferty testified that there were no conversations during the drive from the scene of the shooting to the Internal Affairs Department. Sergeant Allen, however, testified that there were conversations about what had happened—there had to be, since it was the sergeants' job, not the officers', to report what had happened to IAD. This discrepancy, Plaintiffs argue, calls into question whether the officers have shaded their testimony to avoid the appearance that they had an opportunity to get their stories straight.[172]

Moreover, Plaintiffs suggest, even if the officers' initial decision to begin shooting at Sowell were constitutionally reasonable, there is a triable issue of fact as to whether they should have stopped shooting sooner. 109 total shots were fired, 25 of which hit Sowell.[173] Some of those hit him in his back, and two hit him in the soles of his feet.[174] Both the total number of shots and the placement of Sowell's wounds suggest that the officers continued to fire after any threat of imminent harm was contained, Plaintiffs argue.

Claims of excessive force are analyzed under the Fourth Amendment's "objective reasonableness" standard.[175] "It is unreasonable for an officer to use deadly force against a suspect unless the officer has good reason 'to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'"[176] In determining whether an officer

---

[172] Antoinette Finney also testified that her neighbor told her that immediately after the shooting, the neighbor heard one officer say to another, "we effed up." Finney Dep. [Doc. No. 31-4], May 14, 2019, at 66. It is not clear whether this double hearsay statement could be admissible at trial, so the Court has not considered it for purposes of this motion.

[173] Statement of Stipulated Material Facts [Doc. No. 23-1] ¶ 32.

[174] Autopsy Report [Doc. No. 32-1].

[175] *Graham v. Connor*, 490 U.S. 386, 388 (1989).

[176] *Lamont*, 637 F.3d at 183 (quoting *Garner*, 471 U.S. at 3).

20

violated this standard, courts recognize that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[177] Reasonableness is therefore judged from the perspective of the officer at the scene, not with the benefit of hindsight from the "peace of a judge's chambers."[178] Whether the amount of force used was reasonable may depend on "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."[179] Other relevant factors include "the duration of the [officer's] action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time."[180] "[A]n officer who uses deadly force in the mistaken belief that a suspect is armed will be forgiven so long as the mistake is reasonable and the circumstances otherwise justify the use of such force."[181]

At the same time, in any deadly-force case, the victim is "unable to testify."[182] The Third Circuit has therefore recognized that on summary judgment in such a case, courts "should be cautious . . . to 'ensure that the officer[s are] not taking advantage'" of the unavailability of the witness most likely to contradict their account—"the person shot dead."[183] Courts must therefore

---

[177] *Graham*, 490 U.S. at 397.

[178] *Id.* at 396–97 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

[179] *Id.* at 396.

[180] *Couden v. Duffy*, 446 F.3d 483, 497 (3d Cir. 2006) (quoting *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997), *abrogated on other grounds by Curley v. Klem*, 499 F.3d 199 (3d Cir. 2007)).

[181] *Lamont*, 637 F.3d at 183.

[182] *Id.* at 181–82 (quoting *Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999)).

[183] *Id.* (quoting *Abraham*, 183 F.3d at 294).

21

avoid simply accepting the officers' account, which may be "self[-]serving."[184] Rather, courts must "look at the circumstantial evidence that, if believed, would tend to discredit the police officer[s'] story, and consider whether this evidence could convince a rational fact finder that the officer[s] acted unreasonably."[185]

### a. Reasonableness of Initial Use of Deadly Force

Applying those standards here, Sowell's actions at the Cobbs Creek house, as described by the officers, would unquestionably constitute an immediate threat of harm to the officers. The Court must not, however, simply accept their description at face value. Instead, on summary judgment, the Court must compare the officers' account with any circumstantial evidence that tends to discredit it. Here, it is undisputed that no gun or other weapon was recovered near Sowell, and all parties appear to agree that he was in fact unarmed.[186] The officers' uniform testimony that they saw and heard Sowell fire a gun is therefore inexplicable.

The officers, perhaps recognizing that this raises a triable issue, attempt to argue that it is irrelevant whether Sowell actually had a gun and fired it. The officers argue their use of deadly force would have been reasonable had they merely seen him draw an object out of his pocket in a threatening motion, knowing they were looking for a suspect who might be armed. Therefore, they argue, their use of deadly force here was *a fortiori* reasonable because they saw at least that much and then some—they saw a gun in Sowell's hand and saw and heard him fire it.[187]

The Court cannot agree. When it is undisputed that a suspect "move[d] as though to draw a gun," that motion by itself can justify the use of deadly force, since "[a]n officer is not

---

[184] *Id.* (quoting *Abraham*, 183 F.3d at 294).

[185] *Id.* (quoting *Abraham*, 183 F.3d at 294).

[186] Statement of Stipulated Material Facts [Doc. No. 23-1] ¶¶ 33–34.

[187] Defs.' Reply Mem. Supp. Summ. J. [Doc. No. 31] at 23.

constitutionally required to wait until he sets eyes upon [a] weapon before employing deadly force."[188] Here, however, the officers' argument is not merely that they made a reasonable mistake in assessing that Sowell was armed. Instead, their argument is that they *saw Sowell fire a gun*, even as they acknowledge that he had no gun. They offer no explanation of how they could have seen and heard a gunshot when Sowell was unarmed. In light of that dispute of material fact, which goes directly to credibility, the Court cannot blindly credit the officers' statements that Sowell moved threateningly to pull his hand out of his pocket, drew an object that could be mistaken for a gun, or pointed it at the officers. After all, a jury can properly discount all of a witness's testimony if it finds some of the witness's statements untrue.[189]

On a motion for summary judgment, the Court is required to view the facts in the light most favorable to the non-movant.[190] This circumstantial evidence—that is, the absence of a gun—creates a genuine dispute of material fact as to the credibility of the officers' entire account of the shooting. Because courts cannot weigh facts or make credibility determinations on summary judgment, the Court is required to set aside the sequence of events as described by the officers.[191] Viewed in the light most favorable to Plaintiffs, therefore, the facts show only that the

---

[188] *Thompson*, 257 F.3d at 899; *see also Lamont*, 637 F.3d at 183–84.

[189] *See* Third Circuit Model Civil Jury Instructions § 1.07 ("You are the sole judges of the credibility of the witnesses. . . . You may believe everything a witness says or only part of it or none of it.").

[190] *Tolan v. Cotton*, 572 U.S. 650, 651 (2014); *Couden v. Duffy*, 446 F.3d 483, 492–93 (3d Cir. 2006) (reversing judgment of district court, which failed to consider all facts in the light most favorable to non-movant); *see also Harris v. Pittman*, 927 F.3d 266, 272–75 (4th Cir. 2019) (reversing grant of summary judgment for officer where district court drew inferences in the officer's favor).

[191] *See Rogoz v. City of Hartford*, 796 F.3d 236, 246 (2d Cir. 2015) (reversing grant of summary judgment for police officers in excessive-force case because "summary judgment is proper only when, if all permissible inferences and credibility questions are resolved in favor of the party against whom judgment is sought, 'there can be but one reasonable conclusion as to the verdict'" (quoting *Liberty Lobby*, 477 U.S. at 250)); *see also id.* at 249 ("The question of Rogoz's credibility was a matter for the factfinder; it was not a matter that the court could properly resolve on a motion for summary judgment.").

officers confronted a man who was believed to have attacked and injured three children earlier that evening, possibly with a gun, and no more.[192]

Additionally, there is a genuine dispute of material fact as to whether the officers ordered Sowell to show his hands before shooting at him. The officers' descriptions of the commands they gave him are inconsistent with each other. Some officers say only one of them gave commands because that was how they were trained; others said multiple officers gave Sowell commands.[193] Their descriptions are also inconsistent with the testimony of Antoinette Finney. The officers testified that they were "screaming" commands at Sowell,[194] but Finney, who was in the front room of the house, testified that she "didn't hear the police" and assumed the flashes and sounds from outside were from firecrackers set off by Sowell, not gunfire.[195] A reasonable jury could conclude from these inconsistencies that the officers did not give Sowell any commands, but rather opened fire immediately upon seeing him step out of the door.

---

[192] Viewing the facts in the light most favorable to Plaintiffs, the Court also finds there is a genuine dispute as to whether any officer saw Sowell struggling with a woman in the doorway of the Cobbs Creek house. Only Officer Kane testified to seeing this, even though other officers who arrived simultaneously did not say they saw a struggle, *compare* Kane Dep. [Doc. No. 31-8], Jan. 16, 2019, at 17–18, *with* Thompson Dep. [Doc. No. 31-13], Feb. 28, 2019, at 9, and Antoinette Finney testified that she and her daughter—the only two people in the Cobbs Creek house at the time—were inside in the house during the entire incident, not in the doorway or on the porch where a struggle might be observed. Finney Dep. [Doc. No. 31-4], May 14, 2019, at 18–21, 24–25.

The parties have not addressed in much detail the testimony of several officers that they heard screaming when they arrived at the Cobbs Creek house. Even if the central credibility dispute did not require the Court to set aside the officers' description of the encounter at the Cobbs Creek house, this testimony would not affect the analysis. No officer suggested that they heard screaming during or immediately before the shooting. The operative facts, therefore, would remain the same—viewing the facts in the light most favorable to Plaintiffs, the officers shot a man suspected of a violent offense who might be armed, but who was not fleeing, resisting arrest, or posing an immediate threat.

[193] *Compare* Thompson Dep. [Doc. No. 31-13], Feb. 28, 2019, at 11 (testifying that only Officer Kane gave verbal commands because officers are "trained to only have one person be the contact person" to avoid "confus[ing] the person you're giving commands to"), *with* Hustler Dep. [Doc. No. 31-7], Jan. 31, 2019, at 11–12 (testifying that both he and Officer Kane gave Sowell verbal commands), *and* Edwards Dep. [Doc. No. 31-11], Jan. 16, 2019, at 17–18 (testifying that Officer Edwards gave Sowell verbal commands to "remove his hands from his pockets").

[194] *See, e.g.*, Britton Dep. [Doc. No. 31-9], Jan. 31, 2019, at 14.

[195] Finney Dep. [Doc. No. 31-4], May 14, 2019, at 21–22, 26.

In an ordinary case, the serious, violent offenses of which Sowell was suspected, as well as the circulating reports that he might be armed with a gun, would weigh heavily in favor of finding the officers' use of deadly force to be reasonable. Here, however, while those precursors are undisputed, the entire encounter between Sowell and the officers is subject to genuine dispute. Without resolving factual disputes, therefore, the Court cannot assume that Sowell was warned to show his hands or that he gave any indication of fleeing, of resisting arrest, or of posing a threat to the officers or others. Under these circumstances as the Court must view them for summary-judgment purposes, it was not reasonable for the officers to resort immediately to deadly force, even though Sowell was believed to have committed violent crimes.[196]

A reasonable jury could conclude that because Sowell was unarmed, the officers' account of the shooting is inaccurate, Sowell did not pose an immediate threat, and the use of deadly force was unreasonable. Of course, "a jury could also conclude that he did [pose an immediate threat], but '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . on a motion for summary judgment.'"[197] Taking all facts in the light most favorable to them, Plaintiffs have shown a violation of Sowell's constitutional right to be free of unreasonable seizures.

---

[196] *Curley v. Klem*, 298 F.3d 271, 273–74, 280 (3d Cir. 2002) (denying summary judgment to officer in light of disputes of material fact where officer was pursuing a suspect in the murder of a police officer); *see Bennett ex rel. Estate of Bennett v. Murphy*, 120 F. App'x 914, 918 (3d Cir. 2005) ("[U]nder *Graham* and *Garner* '[l]aw enforcement officers may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed.'"); *see also Abraham*, 183 F.3d at 289 ("Giving due regard to the pressures faced by the police, was it objectively reasonable for the officer to believe, in light of the totality of the circumstances [including the severity of the crime at issue], that deadly force was necessary to prevent the suspect's escape, *and* that the suspect posed a significant threat of death or serious physical injury to the officer or others?" (emphasis added)).

[197] *Flythe v. District of Columbia*, 791 F.3d 13, 22 (D.C. Cir. 2015); *see also id.* (denying summary judgment to officer where genuine dispute of material fact existed as to whether suspect threatened officer with a knife); *see also Green v. N.J. State Police*, 246 F. App'x 158, 161 (3d Cir. 2007).

## b. Reasonableness of Continued Use of Deadly Force

Plaintiffs argue that even if the officers' initial decision to use deadly force was reasonable, the total amount of force used was not.[198] In this case, nine officers fired 109 rounds at Sowell. Twelve of the twenty-five bullets that struck Sowell hit him from behind. Another two of Sowell's gunshot wounds were in the soles of his feet. Viewing the facts in the light most favorable to them, Plaintiffs argue, the officers "improperly continued firing after Sowell . . . no longer posed a threat."[199]

The officers argue that their placement at the scene of the shooting explains the gunshot wounds to Sowell's back. Sowell was standing on the front steps of a house that was located at a corner, with the landing facing one street and perpendicular to another. The officers testified that some of them were facing Sowell straight on, while others were positioned around the corner, such that when he allegedly turned his body sideways, his back was to them.[200] A jury could certainly agree with that account, but viewing the facts in the light most favorable to Plaintiffs, the Court cannot assume that the officers' positions fully and reasonably account for the twelve gunshot wounds to Sowell's back. More importantly, the officers have given no explanation for the two gunshot wounds to the soles of Sowell's feet. The placement of those wounds would allow a jury to conclude that the officers continued firing even after Sowell had fallen to the ground and was no longer a threat.[201]

Additionally, there is a genuine dispute of material fact as to the timing of the shooting. Again, the officers' testimony is both internally inconsistent and inconsistent with the testimony

---

[198] Pls.' Mem. Opp. Summ. J. [Doc. No. 25-1] at 35–36.

[199] Pls.' Reply Mem. Opp. Summ. J. [Doc. No. 32] at 3.

[200] Defs.' Sur-Reply Mem. Supp. Summ. J. [Doc. No. 35] at 2–3.

[201] *Lamont*, 637 F.3d at 184–85 ("Even where an officer is initially justified in using force, he may not continue to use such force after it has become evident that the threat justifying the force has vanished.").

26

of Antoinette Finney. Some officers testified that the shooting was continuous and uninterrupted until Sowell went down, while others testified that there were multiple separate "bursts" of shooting.[202] A reasonable jury could conclude from that testimony that at least some officers had an opportunity to reevaluate whether Sowell posed an imminent threat and that resuming shooting was constitutionally unreasonable. Moreover, while Finney estimated that the shooting lasted for more than a minute,[203] the officers estimated that it lasted "a matter of seconds."[204] Of course, a jury could decide to credit the officers' testimony as more likely to be accurate. On a summary-judgment posture, however, it is impossible for the Court to conclude that the totality of the shooting was reasonable as a matter of law. Viewing the facts in the light most favorable to Plaintiffs, they have also shown that the officers violated Sowell's constitutional rights by continuing to use deadly force after any imminent threat was neutralized.

## 2. "Clearly Established" Inquiry

"Qualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[205] "For a right to be clearly established, 'there must be sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put defendant on notice that his or her conduct is constitutionally prohibited.'"[206] In analyzing whether the law was clearly established

---

[202] *Compare, e.g.*, Walton Dep. [Doc. No. 31-12], Feb. 28, 2019, at 10 (testifying that all shots he fired were "in succession"), *with, e.g.*, Green Dep. [Doc. No. 31-6], Feb. 28, 2019, at 13–14 (testifying that he fired at least two bursts of shots).

[203] Finney Dep. [Doc. No. 31-4], May 14, 2019, at 26.

[204] Olesik Dep. [Doc. No. 31-10], Jan. 16, 2019, at 37.

[205] *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix*, 136 S. Ct. at 308).

[206] *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 762 (3d Cir. 2019) (quoting *Mammaro v. N.J. Div. of Child Prot. & Permanency*, 814 F.3d 164, 169 (3d Cir. 2016)).

at the time of the constitutional violation,[207] courts must avoid defining the contours of the right at a high level of generality.[208] This is especially true in the Fourth Amendment context, where "it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts."[209] General statements of the law, like those in *Graham* and *Garner*, "do not by themselves create clearly established law outside an 'obvious case.'"[210] Although a case exactly on point is not required, excessive force is a fact-bound doctrine.[211] Police officers are therefore "entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue."[212]

This fact-specific approach set out by the Supreme Court is a particularly odd fit for cases like this one. The Court has advised that "[i]f the law did not put the officer on notice that *his conduct* would be clearly unlawful, summary judgment based on qualified immunity is appropriate."[213] In this case, however, where credibility is an issue and most of the operative facts are therefore in dispute, it is a futile exercise to attempt to determine whether the officer's "conduct," which is wholly undefined, violated clearly established law. Critical disputes leave the fatal encounter with essentially no factual content with which to make the fact-intensive comparisons that are the crux of the qualified immunity analysis.[214] There is a ghost at the center

---

[207] *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) ("Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.").

[208] *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

[209] *Id.* (quoting *Mullenix*, 136 S. Ct. at 308).

[210] *White*, 137 S. Ct. at 552 (quoting *Brosseau*, 543 U.S. at 199).

[211] *Kisela*, 138 S. Ct. at 1152.

[212] *Id.* (quoting *Mullenix*, 136 S. Ct. at 309).

[213] *Saucier*, 533 U.S. at 202 (emphasis added).

[214] *See Curly v. Klem*, 499 F.3d 199, 208 (3d Cir. 2007) (noting that the Supreme Court's instruction that qualified immunity should ordinarily be decided well before trial "is well and good when there are no factual issues in a case," but that "often the facts are intensely disputed, and our precedent makes clear that such disputes must be resolved by a jury after a trial"). Indeed, some Justices have aptly recognized that some, and perhaps all, excessive

of this case, and there is little use in comparing its hazy outline with the fact patterns of other officer-involved shootings. Nevertheless, it is crystal clear that the Court is required to conduct both steps of the *Saucier* analysis—in this context, courts may not deny summary judgment simply because there are genuine disputes of material fact,[215] as Rule 56 would otherwise seem to require.[216]

### a. Initial Use of Deadly Force

Even if there were no cases directly on point, the Court would conclude that the unreasonableness of the officers' conduct in shooting Sowell—again, on the current record and viewing the facts in the light most favorable to Plaintiffs—was so obvious that it meets the standard for clearly established law. There are cases in which, although the applicable constitutional rule is expressed in general terms, that general rule "appl[ies] with obvious clarity to the specific conduct in question."[217] As long as "the state of the law" gives "fair warning" of what is permitted and what is forbidden, "officials can still be on notice that their conduct violates established law even in novel factual circumstances."[218] Indeed, the Third Circuit held, in a case with some similarities to this one, that the "immediate threat" standard of *Graham* and *Garner*, although general, would have made it clear to reasonable officers that they could not shoot an "armed distraught man" who was not fleeing and not threatening anyone but himself.[219]

---

force cases are simply "not meet" for the two-part qualified immunity inquiry. *Saucier*, 533 U.S. at 214 (Ginsburg, J., concurring, joined by Stevens & Breyer, JJ.).

[215] *Saucier*, 533 U.S. at 202.

[216] Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

[217] *Bennett*, 120 F. App'x at 918 (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)).

[218] *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

[219] *Bennett*, 120 F. App'x at 918. *See also Terebesi v. Torreso*, 764 F.3d 217, 240 (2d Cir. 2014) (explaining that qualified immunity could not be granted on summary judgment where "the credibility of [the officer's] recollection of these events was subject to genuine dispute").

29

In this case, however, it is not necessary to rely on the obviousness of the constitutional violation. Published Third Circuit precedent put the officers on notice well before September 2016 that using deadly force in these circumstances was unreasonable. In *Couden v. Duffy*, the Third Circuit considered an excessive force claim very similar to this one.[220] Members of the Delaware Joint Violent Crime Fugitive Task Force were pursuing a fugitive wanted on serious charges.[221] Officers found Adam Couden in his garage near the house they were surveilling.[222] "[F]our officers jumped on Adam, pointed guns at his head, handcuffed him, and sprayed him with mace."[223] "Although the officers may have believed that Adam was an intruder at the time," the Court of Appeals held, the level of force the officers used was "unnecessary and constitutionally excessive" because "[t]here was no evidence that Adam was resisting arrest or attempting to flee" and because the officers outnumbered him four-to-one.[224] Here, similarly, viewing the facts in the light most favorable to Plaintiffs, although the officers were pursuing someone suspected of serious crimes, Sowell was not resisting arrest or attempting to flee, and he was outnumbered nine-to-one. Under those circumstances, any reasonable officer would have understood from *Couden* that shooting Sowell was constitutionally excessive.

Of course, a case *exactly* on point is rare, and there are slight factual differences between *Couden* and this case. The Court of Appeals noted in *Couden* that "[t]he police had no reason to believe that Adam was armed," although the fugitive suspect they were pursuing was wanted for "weapons-related charges."[225] Here, by contrast, some reports had circulated on police radio that

---

[220] 446 F.3d 483 (3d Cir. 2006).
[221] *Id.* at 489.
[222] *Id.*
[223] *Id.* at 497.
[224] *Id.*
[225] *Id.* at 489.

30

one of Sowell's victims had a possible gunshot wound, so the officers had some reason to be wary that Sowell could be armed.[226] As noted, however, the Supreme Court's "caselaw does not require a case directly on point for a right to be clearly established."[227] Rather, the question is whether "existing precedent [has] placed the statutory or constitutional question beyond debate."[228] That is exactly what *Couden* did.[229]

### b. Continued Use of Deadly Force

Similarly, even if the initial use of force was reasonable, the unreasonableness of the officers' continued use of deadly force was clearly established under published Third Circuit precedent. More than five years before these events, the Third Circuit had held that it was already clearly established that "[e]ven where an officer is initially justified in using force, he may not continue to use such force after it has become evident that the threat justifying the force has vanished."[230] In *Lamont v. New Jersey*, troopers pursued a car theft suspect in "the dark, thicket-filled woods bordering the interstate."[231] When the troopers spotted the suspect, they ordered him to show his hands, which were concealed in his waistband.[232] It was undisputed that the suspect "suddenly pulled his right hand out of his waistband" in a movement "similar to that

---

[226] Statement of Stipulated Material Facts [Doc. No. 23-1] ¶ 7.

[227] *Kisela*, 138 S. Ct. at 1152 (quoting *White*, 580 U.S. at 551).

[228] *Id.* (quoting *White*, 580 U.S. at 551).

[229] Additionally, even if the officers reasonably believed that Sowell was armed, another Third Circuit case clearly established that it is not reasonable to shoot an armed suspect who is not fleeing, resisting arrest, or threatening anyone but himself. *Bennett*, 120 F. App'x at 917–18.

[230] *Lamont*, 637 F.3d at 184; *see also Harris*, 927 F.3d at 272 (4th Cir. 2019) ("[F]orce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." (quoting *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005))); *Fancher v. Barrientos*, 723 F.3d 1191, 1199–1200 (10th Cir. 2013); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1045 (6th Cir. 1992).

[231] 637 F.3d at 183.

[232] *Id.*

31

of drawing a gun."[233] The two troopers opened fire on the suspect, who turned out to be unarmed, firing 39 rounds.[234] Eighteen of those hit the suspect, eleven of them from behind.[235]

While the Third Circuit held that the officers' initial use of force was reasonable in light of the undisputed hand movement, the court explained that "the evidence would permit the conclusion that the troopers continued firing at [the suspect] after a reasonable officer would have realized that he did not pose a serious threat and stopped shooting."[236] It was clearly established that the law permitted officers to use deadly force only so long as a suspect posed an immediate threat; once the threat was neutralized, or once it became clear that the officers were mistaken in their assessment of the threat, the officers were required to stop shooting.[237] Thus, the troopers were not entitled to qualified immunity on the total amount of deadly force used, even though they were entitled to qualified immunity on the initial use of deadly force.

*Lamont* would give any reasonable officer adequate notice that the use of deadly force is only permitted so long as an immediate threat persists.[238] Viewing the facts in the light most favorable to them, Plaintiffs have shown that the officers violated Sowell's clearly established right to be free of unreasonable seizures. As a result, summary judgment will be denied and Plaintiffs' excessive-force claim will proceed to trial.

---

[233] *Id.*

[234] *Id.* at 180.

[235] *Id.* at 184.

[236] *Id.* at 185. In *Lamont*, it was undisputed that the suspect moved his hand as if he were drawing a gun. *Id.* at 184. Here, on summary judgment, the Court cannot assume that Sowell moved his hand threateningly because, as explained above, the absence of a gun creates a genuine dispute as to the entirety of the brief, rapid sequence that unfolded when the officers confronted Sowell.

[237] *Id.*

[238] Indeed, *Lamont* held that this principle was already clearly established in 2011. *Id.* at 185.

32

## B. *Monell* Claim

Municipalities may be sued under § 1983 for violations of constitutional rights.[239] Claims of municipal liability may proceed in two ways. First, a plaintiff may allege that "an unconstitutional policy or custom of the municipality led to his or her injuries."[240] Second, as here, a plaintiff may allege that his or her injuries "were caused by a failure or inadequacy by the municipality that 'reflects a deliberate or conscious choice.'"[241] Failure-or-inadequacy liability can take several forms, including failure to train, failure to supervise, and failure to discipline.[242]

To prevail on a failure-or-inadequacy theory in this context, a plaintiff need not show an unconstitutional policy or custom. Instead, a plaintiff must show that the municipality's failure reflects its "deliberate indifference to the constitutional rights of persons with whom the police come into contact."[243] A municipality is deliberately indifferent where "(1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights."[244]

### 1. Failure to Train and Equip

Plaintiffs argue that the City is liable for Sowell's death because the Police Department did not mandate crisis-intervention training for its officers and did not equip all of its officers with tasers. For a failure-to-train claim, as for other species of municipal liability claims, "the identified deficiency in a city's training program must be closely related to the ultimate

---

[239] *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690–92 (1978).

[240] *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019).

[241] *Id.* (quoting *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019)).

[242] *Id.* at 105–06.

[243] *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *see Forrest*, 930 F.3d at 106.

[244] *Forrest*, 930 F.3d at 106.

injury."[245] That is, a plaintiff must show that the municipality "through its deliberate conduct was the moving force behind the injury alleged."[246]

To survive summary judgment on their claim that the City failed to train its police officers adequately, Plaintiffs point out that the Police Department offers but does not mandate crisis-intervention training. According to Plaintiffs, crisis-intervention training aims to teach officers how to de-escalate encounters with citizens experiencing mental health crises. It is foreseeable that officers will encounter such citizens, Plaintiffs argue, so the Department's failure to make any training in this area mandatory amounts to deliberate indifference. Compounding the problem, the Department does not make tasers available to officers who have not undergone the optional crisis-intervention training. The City had actual notice that this aspect of its policy was inadequate: A 2015 DOJ report recommended that the Department "decouple [tasers] and [crisis-intervention training] both conceptually and operationally" and make tasers "standard-issue weapons" for all officers assigned to uniformed enforcement units.[247] The Department did not implement those recommendations.[248] In encounters like this one, therefore, many officers have neither the training nor the equipment to de-escalate and will foreseeably resort to using avoidable deadly force.

As Defendants point out, however, the causal link between the City's taser training and Sowell's death is tenuous. Four of the nine officers who shot Sowell had undergone the training and were equipped with tasers at the time of the shooting. Yet all nine officers used their guns

---

[245] *Harris*, 489 U.S. at 391; *see Forrest*, 930 F.3d at 109.

[246] *Tarapchak v. County of Lackawanna*, 739 F. App'x 172, 178 (3d Cir. 2018); *see also Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014).

[247] DOJ Report [Doc. No. 25-12] at 4.

[248] Cuddahy Dep. [Doc. No. 25-10], June 26, 2019, at 29, 58–60. In his deposition, Officer Cuddahy insisted that the recommendations *had* been implemented, but admitted that tasers are still issued only to crisis-intervention-trained officers and that crisis-intervention training is still optional. *Id.* at 58–60.

here—none used a taser. The City's decision to make crisis-intervention training optional and to issue tasers only to some officers therefore could not have been the "moving force" behind Sowell's injury, because the officers who underwent the training and were equipped with tasers responded the same way as those who had not and were not.[249] Even assuming a jury could find that the City was deliberately indifferent, therefore, there is no genuine dispute as to whether the City's deliberate indifference *caused* the deprivation of Sowell's constitutional rights. Thus, the City is entitled to summary judgment on this claim.

### 2. Failure to Supervise and Discipline

Plaintiffs also argue that the City is constitutionally liable because its Police Department ran "an ineffective disciplinary system whose paramount purpose is to protect the police officers," not to uncover the facts of officer-involved incidents like this one. A municipality's failure to supervise and discipline its police officers can be the basis for § 1983 liability, as explained above.[250] In this context, a plaintiff establishes a municipality's deliberate indifference by showing that (1) the municipality knew its officers would require supervision or discipline; (2) there was a history of officer supervision or discipline being mishandled; and (3) in the absence of supervision or discipline, constitutional violations were likely to result.[251]

Aside from some conclusory statements that there is no record evidence of the City's deliberate indifference, the City develops only one argument for granting summary judgment on this claim. It argues that "[t]he timing of the Defendant Officers' interviews and the manner in which they were conducted *after* the shooting could not have been the moving force of the

---

[249] Plaintiffs have not argued that the training itself was inadequate. Instead, they have argued only that the City was deliberately indifferent in making it optional and in refusing to make tasers standard issue.

[250] *Forrest*, 930 F.3d at 105–06, 108.

[251] *Id.* at 108.

shooting itself."[252] But courts have frequently concluded that inadequate investigatory and disciplinary practices can be the basis for § 1983 liability even though those processes necessarily follow *after* the underlying constitutional violations.[253] In such cases, the theory is not that inadequate investigation and discipline retroactively caused the alleged misconduct. Instead, the theory is that by failing to investigate misconduct and discipline offending officers, the municipality over time created an environment in which officers did not expect to be held accountable for their actions and behaved accordingly.

   Plaintiffs have offered evidence that would allow a reasonable jury to conclude that such an environment existed here. As far back as 2004, a report by the Department's Integrity and Accountability Office had identified significant problems with the Department's investigatory process following officer-involved shootings. That report advised that the City "should require more stringent and meaningful supervisory review and oversight of all officer and witness interviews to insure their thoroughness, quality, and impartiality."[254] In particular, the IAO report noted that the City did not require officers to submit to audio- or video-recorded interviews and recommended that it start doing so.[255] Recorded interviews "are regarded as more reliable, useful, and compelling," the report noted, especially since "[i]nvestigative outcomes frequently hinge on the 'credibility' of witnesses."[256] Taking manual dictation while conducting interviews also diverts interviewers' attention from a witness's "demeanor and other visual non-verbal cues,

---

[252] Defs.' Reply Mem. Supp. Summ. J. [Doc. No. 31] at 31.

[253] *See, e.g., Forrest*, 930 F.3d at 108-09; *Estate of Roman*, 914 F.3d at 800–01 (holding that *Monell* liability could be based on "a failure to supervise and manage officers" and "a failure to discipline officers" leading to a "complete lack of accountability" and "a culture in which officers 'knew there would be no professional consequences for their action[s]'"); *Estevez v. City of Philadelphia*, No. 06-3168, 2007 WL 707358, at *7–8 (E.D. Pa. Mar. 2, 2007).

[254] IAO Report [Doc. No. 25-8] at 48.

[255] *Id.* at 45–46, 48.

[256] *Id.* at 45.

36

which are important factors in guiding and directing the interviewer," and written notes often fail to capture those nuances, which can be "as revealing and important as the verbal responses."[257] For those reasons, the vast majority of law-enforcement agencies had updated their practices as of the 2004 report, making the Department "one of the last major law enforcement agencies in the nation that does not audio-tape or video-tape the interviews of witnesses and officers."[258] Yet more than ten years later, the DOJ report confirmed that this exact flaw persisted, noting that the Department's practice was still to take notes in lieu of recording interviews with officers.[259] The officers who shot Sowell were interviewed according to the Department's longstanding and flawed method.[260]

Even more troubling, both the 2004 IAO report and the 2015 DOJ report also explained that the Department's policy was not to interview an involved officer at all until the District Attorney's Office declined to file charges.[261] "As a result," the DOJ report noted, "most officers involved in shootings are not interviewed until *three or more months* after the incident occurred."[262] The problems inherent in such a policy are obvious—a witness's account of an event is freshest and most candid immediately afterwards. Waiting months to interview key participants and witnesses allows memories to fade and, worse, accounts to be planned or tweaked. The DOJ report recommended that officers involved in shootings be interviewed as

---

[257] *Id.*

[258] IAO Report [Doc. No. 25-8] at 46.

[259] DOJ Report [Doc. No. 25-12] at 6.

[260] Young Dep. [Doc. No. 25-9], Mar. 27, 2019*, at 30.

[261] IAO Report [Doc. No. 25-8] at 41 n.22; DOJ Report [Doc. No. 25-12] at 6.

[262] DOJ Report [Doc. No. 25-12] at 6 (emphasis added).

soon as practical, and always within 72 hours of the incident. That change was not implemented, either.[263]

Plaintiffs argue these practices were not only problematic as a general matter, but also facilitated a possible "cover-up" in this case.[264] They point to the officers' conflicting testimony about whether they discussed the shooting immediately after it occurred. Most of the officers said there were no conversations at all at that time,[265] and one said they talked only to confirm that no one was hurt but did not discuss the incident further than that.[266] Sergeant Allen, however, testified that she did discuss the shooting with the officers that night.[267] Indeed, she testified that she had to: The investigative policy required that she and Sergeant Rafferty learn what happened and then convey the details of the shooting to Internal Affairs, as the officers themselves could not be interviewed for months.[268] One officer appeared to confirm this, testifying that a supervisor asked them what happened and "took notes" before transporting them to Internal Affairs.[269] Plaintiffs argue that this contradiction raises questions about whether the officers used this opportunity to get their stories straight and, in turn, about the veracity of the officers' account overall.

In light of this long history of inadequate investigations, a jury could find that the dearth of serious supervision and discipline created the conditions for constitutional violations. First, the

---

[263] Young Dep. [Doc. No. 25-9], Mar. 27, 2019*, at 13–14.

[264] Pl.'s Mem. Opp. Summ. J. [Doc. No. 25-1] at 49.

[265] Rafferty Dep. [Doc. No. 25-26], Mar. 27, 2019*, at 26–28; Green Dep. [Doc. No. 25-8], Feb. 28, 2019, at 23–24; Thompson Dep. [Doc. No. 25-24], Feb. 28, 2019, at 18; Walton Dep. [Doc. No. 25-7], Feb. 28, 2019, at 15–16; Hustler Dep. [Doc. No. 25-23], Jan. 31, 2019, at 25, 30; Britton Dep. [Doc. No. 25-22], Jan. 31, 2019, at 27–28; Kane Dep. [Doc. No. 25-6], Jan. 16, 2019, at 33.

[266] Moebius Dep. [Doc. No. 25-21], Jan. 31, 2019, at 31–34.

[267] Allen Dep. [Doc. No. 25-27], Mar. 27, 2019*, at 42–44.

[268] *Id.*

[269] Olesik Dep. [Doc. No. 25-5], Jan. 16, 2019, at 42–43.

City knew "to a moral certainty"—based on the many previous officer-involved shootings it documented, and also because it would be obvious to any law-enforcement agency—that its officers would require supervision and discipline after use-of-force incidents.[270] Second, the City was repeatedly admonished, by its own police oversight agency and by the Department of Justice, that its investigative practices were unacceptable. Third, those problematic practices were likely to result in constitutional violations. In the absence of basic accountability measures like conducting interviews promptly and audio- or video-recording them, there was a substantial risk that the main goal of internal investigations would not be impartial factfinding and appropriate discipline, but would instead be "damage control or cover-up."[271]

A jury could find that this lack of accountability demonstrated the City's deliberate indifference to Sowell's constitutional rights. A jury could also find that these practices created "a culture in which officers 'knew there would be no professional consequences for their action[s]'"[272] and thus "contributed to the specific constitutional violations" asserted here by creating both an opportunity and a safe environment for officers inclined to protect themselves by collectively falsifying their narrative of their own actions.[273] Summary judgment will therefore be denied on Count Nine, Plaintiffs' *Monell* claim, as to their claim of failure to supervise and discipline.

## C. State-Law Tort Claims

Plaintiffs bring claims against the officers for assault and battery under state law. The officers argue these claims are barred by the Pennsylvania Political Subdivision Tort Claims

---

[270] *Estate of Roman*, 914 F.3d at 800; *see Forrest*, 930 F.3d at 108.

[271] IAO Report [Doc. No. 25-8] at 48 n.27.

[272] *Estate of Roman*, 914 F.3d at 801.

[273] *Id.* at 800.

Act.[274] "Agency employees are generally immune from liability under the PSTCA for acts committed within the scope of their employment."[275] Under § 8550 of the Act, however, that immunity does not extend to act that "constitute[] a crime, actual fraud, actual malice or willful misconduct."[276] To prove "willful misconduct," a plaintiff must show that "the actor desired to bring about the result that followed, or at least it was substantially certain to follow, *i.e.*, specific intent."[277] In other words, "'willful misconduct' in this context has the same meaning as the term 'intentional tort.'"[278]

It is not enough, therefore, for Plaintiffs to show that the officers intended to shoot Sowell. Instead, they would need to show that the officers "specifically intended to use excessive force."[279] This is an exceptionally high bar, and Plaintiffs have not met it. Although a jury could find that the officers' actions were unreasonable—that is, they in fact used excessive force— Plaintiffs have not pointed to any evidence based on which a jury could find that their actions were willful—that is, they intentionally used excessive force.[280] Accordingly, summary judgment will be granted for the officers on Count Five, Plaintiffs' state-law assault claim, and Count Seven, Plaintiffs' state-law battery claim.

The same analysis applies to Plaintiffs' claim for intentional infliction of emotional distress. That state-law intentional tort claim is barred by the Pennsylvania Political Subdivision

---

[274] 42 Pa. Cons. Stat. §§ 8541–50.

[275] *Tucker v. Sch. Dist. of Philadelphia*, No. 19-889, 2019 WL 3802066, at *5 (E.D. Pa. Aug. 13, 2019).

[276] 42 Pa. Cons. Stat. § 8550; *see Bright v. Westmoreland County*, 443 F.3d 276, 287 (3d Cir. 2006). Only willful misconduct is potentially relevant here.

[277] *Bright*, 443 F.3d at 287 (quoting *Robbins v. Cumberland Cty. Children & Youth Servs.*, 802 A.2d 1239, 1252–53 (Pa. 2002)).

[278] *Id.* (quoting *Brown v. Muhlenberg Township*, 269 F.3d 205, 214 (3d Cir. 2001)).

[279] *Berry v. City of Philadelphia*, 188 F. Supp. 3d 464, 477 (E.D. Pa. 2016); *see also Lucas v. City of Philadelphia*, No. 1778 C.D. 2011, 2012 WL 8691954, at *3 (Pa. Commw. Ct. June 6, 2012).

[280] *Renk v. City of Pittsburgh*, 641 A.2d 289, 294 (Pa. 1994).

Tort Claims Act, as well.[281] Summary judgment will therefore be granted for the officers on Count Eight.

Plaintiffs also purport to assert claims for federal-law assault and battery. These claims, however, are duplicative of the § 1983 claim for excessive force, which Plaintiffs have successfully asserted as discussed above, because there is no federal constitutional or statutory protection against assault or battery other than the Fourth Amendment. Thus, summary judgment will be granted for the officers on Count Four, Plaintiffs' federal-law assault claim, and Count Six, Plaintiffs' federal-law battery claim.

### D. Wrongful Death Act and Survival Act Claims

Finally, the officers argue that Plaintiffs' claims under the Pennsylvania Wrongful Death Act and the Pennsylvania Survivor Act should be "dismissed" because neither statute "creates a substantive cause of action."[282] It is true that both the Wrongful Death Act and the Survival Act are strictly derivative—that is, they merely "provide a vehicle through which plaintiffs can recover for unlawful conduct that results in death."[283] To recover through either statute, therefore, a plaintiff must show that the decedent had a viable underlying cause of action at the time of his or her death.[284] A viable § 1983 claim can serve as the underlying cause of action supporting a Wrongful Death or Survival action.[285] As explained above, Plaintiffs have a viable

---

[281] *See Nace v. Pennridge Sch. Dist.*, 744 F. App'x 58, 67 (3d Cir. 2018) (applying the Act's immunity bar to a claim for intentional infliction of emotional distress).

[282] Defs.' Mem. Supp. Summ. J. [Doc. No. 23] at 2.

[283] *Sullivan v. Warminster Township*, 765 F. Supp. 2d 687, 707 (E.D. Pa. 2011); *see Sunderland v. R.A. Barlow Homebuilders*, 791 A.2d 384, 390–91 (Pa. Super. Ct. 2002) ("A wrongful death action is derivative of the injury which would have supported the decedent's own cause of action and is dependent upon the decedent's cause of action being viable at the time of death.").

[284] *Johnson v. City of Philadelphia*, 105 F. Supp. 3d 474, 483 (E.D. Pa. 2015).

[285] *See, e.g.*, *Woloszyn v. County of Lawrence*, 396 F.3d 314, 316, 318–19 (3d Cir. 2005); *McDonald-Witherspoon v. City of Philadelphia*, No. 17-1914, 2018 WL 4030702, at *14 (E.D. Pa. Aug. 23, 2018) ("Because we have concluded that Count Three of the Amended Complaint states § 1983 claims against the City and against the Warden in his individual capacity, as well as a Rehabilitation Act claim against the City, and because these claims

excessive-force claim under § 1983. That claim supports Plaintiffs' Wrongful Death and Survival actions, which will not be dismissed.

## IV. CONCLUSION

Nothing in this Opinion should be taken as suggesting that the Court has deemed some evidence more reliable or some witnesses more credible than others; those determinations will be for a jury to make. Because critical facts are genuinely disputed, however, and because the Court is required at this stage to view the facts in the light most favorable to Plaintiffs, summary judgment cannot be granted as to Plaintiffs' excessive-force claim or their *Monell* claim for failure to supervise or discipline. Summary judgment will be granted as to Plaintiffs' state-law tort claims for assault, battery, and intentional infliction of emotional distress, as well as Plaintiffs' federal-law assault and battery claims. An appropriate Order follows.

ENT'D MAR 2 0 2020

---

assert causes of action for wrongful acts that caused Jones's death, we conclude that the Amended Complaint states facially plausible claims under the Wrongful Death and Survival Acts related to Jones's death against the City and the Warden.").

42